UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHANNON LADEL KEYS,

    Petitioner,                                       Case No. 11-11117
v.                                                 Honorable Thomas L. Ludington

RAYMOND BOOKER,

    Respondent.
_____/

**OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL IN FORMA PAUPERIS**

Petitioner Shannon Ladel Keys is currently confined at the Ryan Correctional Facility in Detroit, Michigan. He was convicted by a jury in the Mecosta County Circuit Court of second-degree murder, assault with the intent to rob while armed, and conspiracy to commit unarmed robbery. Keys is serving concurrent sentences of life imprisonment for the conspiracy and murder convictions, and 12 to 25 years' imprisonment for the assault with the intent to rob while armed conviction.

On March 17, 2011, through his attorney F. Martin Tieber, Keys filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He contends that there was insufficient evidence to support his convictions—under an aider and abettor theory—for the offenses of second-degree murder and assault with the intent to rob while armed. Keys also alleges that he was denied a fair trial because the jury viewed him in restraints and the judge failed to give a related cautionary instruction. Further, Keys alleges that his appellate attorney was ineffective because counsel did not raise the fair trial claim on direct appeal. The government filed an answer to Keys's petition, asserting that his claims lack merit. The government is correct, and Keys's petition will be denied.

# I

## A

Keys was convicted following a jury trial in the Mecosta County Circuit Court. The relevant facts—relied upon by the Michigan Court of Appeals and presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1), *see Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009)—are as follows:

> Defendant's convictions arise from the death of Jeremiah "Jake" Monroe, who was shot and killed during a failed robbery attempt. De Lauren Gordon allegedly committed the shooting, and was aided by Marvin Redmond and defendant, who allegedly planned the robbery and drove Gordon to Monroe's residence.
>
> \*   \*   \*   \*   \*
>
> Redmond testified that Gordon was in defendant's presence and eyesight when he placed a gun in the console of defendant's vehicle on the way to Monroe's house the night before Monroe's murder. Unable to find Monroe, the group abandoned their plans to rob Monroe that night, deciding to try again the next night. The jurors could infer from this testimony that defendant knew that Gordon had a gun and would again bring it on the subsequent attempt. Defendant maintains that the evidence shows that he did not plan or intend to assist an armed robbery, and that he actually tried to discourage and prevent Gordon from bringing a gun to the robbery. Defendant emphasizes that Redmond testified that he and defendant advised Gordon "a thousand times" that it was not necessary to use a gun because Monroe would be unlikely to resist the robbery. However, the jurors could infer from this testimony that defendant must have known about Gordon's gun, otherwise he would not have thought it necessary to tell him repeatedly not to use it during the robbery attempt. Furthermore, defendant's belief that Monroe would feel too intimidated and overpowered to resist the robbery attempt was based on defendant's original plan in which four robbers would confront Monroe. In the final plan, only one robber – Gordon – was to confront Monroe, thus raising the possibility that Monroe might attempt to resist and that Gordon would resort to using a weapon to commit the robbery. Additionally, defendant and Redmond did not previously know Gordon, which increased the risk that Gordon would not follow defendant's and Redmond's repeated instructions to not involve a weapon in the robbery attempt.

*People v. Keys*, No. 264387, 2007 WL 395104, at \*1–\*3 (Mich. Ct. App. February 6, 2007).

Previous to the murder, Keys "shot dice" with Monroe and, at times, the games involved

thousands of dollars. *See* Apr. 20, 2005 Tr. 36–37, 71, 87; Apr. 21, 2005 Tr. 35; Apr. 22, 2005 Tr. 156; Apr. 26, 2005 Tr. 104, 128, 170; Apr. 27, 2005 Tr. 163–164. In late February or early March 2003, Keys and Redmond discussed the possibility of robbing one of Monroe's games. Apr. 26, 2005 Tr. 172. Originally Keys's idea, Redmond indicated he might be interested. *Id*. Later, the two discussed the idea again, deciding that neither could participate directly because Monroe knew them. *Id*. at 173, 177–178. However, because the plan was to take drug and dice money—along with cocaine—neither man was concerned that Monroe would report the robbery to the police. *Id*. at 177, 194. So Redmond decided to convince his brother Eli Evans (who lived in Lansing, Michigan and did not know Monroe) to get involved. Apr. 21, 2005 Tr. 61–62, 65; Apr. 26, 2005 Tr. 164, 174–175. Evans was "big and intimidating," and Redmond trusted him. *Id*. at 175.

Keys and Redmond traveled from Big Rapids, Michigan to Lansing, and Redmond invited Evans into Keys's vehicle to discuss the plan. Apr. 21, 2005 Tr. 88–89; Apr. 26, 2005 Tr. 201; Apr. 27, 2005 Tr. 146. Keys explained that the robbery—or "lick"—would be "simple" because it involved a "young white boy." Apr. 21, 2005 Tr. 89; Apr. 26, 2005 Tr. 202. Keys also indicated that the take would be at least a couple of "stacks" (one thousand dollars). Apr. 21, 2005 Tr. 89, 146. Finally, Keys explained that it was necessary to carry out the robbery as soon as possible because Monroe's friend "Cartwright" was out of town. *Id*. at 89–90, 146. At that point, Gordon came to Keys's vehicle as well. *Id*. at 90–91. Evans then introduced Gordon to Keys and Redmond. *Id*. at 91, 122, 155–156, 167; Apr. 26, 2005 Tr. 128, 202–03. Keys then explained to Gordon that it would be an easy robbery. Apr. 26, 2005 Tr. 204.

Keys did warn that Monroe's roommate, Stewart, might be present in the residence, *id*., and that there would be a dog, Apr. 21, 2005 Tr. 95, 97, 146; Apr. 26, 2005 Tr. 213; Apr. 27, 2005 Tr.

-3-

95–96. He also warned that there might be a .12-gauge shotgun in the house, but Evans liked the odds: "[f]our of us against one little, young white boy." Apr. 21, 2005 Tr. 98–99, 103, 146; Apr. 26, 2005 Tr. 213; Apr. 27, 2005 Tr. 134–35.

Redmond testified that during the trip back to Big Rapids, Gordon placed a semi-automatic weapon on the console of Keys's vehicle, and that Keys observed the weapon. Apr. 26, 2005 Tr. 208–09; Apr. 27, 2005 Tr. 5, 84–86, 149. Evans testified that he didn't see the gun, but admitted that he had previously seen Gordon with the semi-automatic pistol. Apr. 21, 2005 Tr. 123–24, 150, 159, 167–69, 173, 175–76, 181–83. Redmond also testified that Keys repeatedly said: "[Y]ou ain't going to need to use a gun for this . . . ." Apr. 27, 2005 Tr. 111. Likewise, Keys and Redmond repeated that no one needed to get hurt. *Id.* at 112.

On the first attempt to rob Monroe, Keys and Redmond reiterated that "[s]houldn't nobody get hurt." Apr. 26, 2005 Tr. 211; Apr. 27, 2005 Tr. 89, 94. While Evans was big and intimidating, he was also stable enough not to hurt or kill anyone. Apr. 27, 2005 Tr. 88–89. Redmond knew nothing about Gordon or his background, but he trusted his brother. *Id.* at 93, 141. Keys also said that they did not need a gun because it would be an easy robbery. Apr. 26, 2005 Tr. 214; Apr. 27, 2005 Tr. 141. Despite similar comments by Redmond, Gordon insisted on taking his weapon. Apr. 27, 2005 Tr. 93–94.

After the men were unable to locate Monroe on the first night, Redmond, Evans, and Gordon returned to Lansing. Once there, Redmond asked Evans if he was going to follow through with the robbery, but Evans declined. Apr. 21, 2005 Tr. 118; Apr. 26, 2005 Tr. 8. Evans did not like the fact that the plan involved only two of them going inside Monroe's house rather than all four. Apr. 21, 2005 Tr.118. Indeed, Evans indicated that the plan "was stupid." *Id.* at 119. Keys called Evans and

asked if they were still coming down. *Id*. Evans told Keys that he was not coming. *Id*. So Keys told Redmond to bring Gordon, and that he would contact a friend in Grand Rapids to replace Evans. Apr. 27, 2005 Tr.10. However, the arrangement fell through, and only Redmond and Gordon returned to participate in the robbery. Apr. 26, 2005 Tr. 174–75; Apr. 27, 2005 Tr.153.

The night of the second attempt, Keys and Monroe went to a casino. Keys told Redmond and Gordon that he had dropped off Monroe. Apr. 27, 2005 Tr. 33. Keys also reported that he and Monroe had talked about what they would do if someone tried to rob them. *Id*. Keys claimed that Monroe said he would not resist a robbery attempt. *Id*. at 34. Keys then emphasized: "You don't really need to use no gun." *Id*. at 38.

After hearing from Keys, Redmond drove Gordon to Monroe's house. *Id*. at 37. Gordon was wearing a dark jacket, dark pants, dark boots, a hunter's mask, and gloves, *id*. at 55–58, 140, and he had duct tape, a muzzle and raw hide bone for the dog, and his gun, *id*. at 37–38, 94–95, 112–13, 138–40. According to Redmond, he again told Gordon no one needed to get hurt. *Id*. 113. Indeed, Redmond claimed he and Keys told Gordon "at least a thousand times" that no one was to be hurt and, that if Monroe "rebelled in any way, just run, just leave the house." *Id*.

Keys and Redmond instructed Gordon to go into Monroe's house alone. Once inside, the robbery attempt failed and Gordon shot and killed Monroe. Keys spotted Gordon as he ran from Monroe's house, and directed Redmond to pick him up. *Id*. at 40–42, 126, 151–52. Gordon told Redmond: "Just get me on the freeway, get me back to Lansing now." *Id*. at 42, 97.

**B**

Keys's convictions and sentence were affirmed on appeal. *Keys*, No. 264387, 2007 WL 395104. He then filed a motion for relief from judgment, which was denied, and the subsequent

appeal of that motion was also denied. Keys sought leave to appeal the decision to the Michigan Supreme Court, but that request was denied as well because Keys "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Keys*, 794 N.W.2d 584 (Mich. 2011).

**II**

Title 28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410–11.

The Supreme Court has explained that "a federal court's collateral review of a state-court

decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (*per curiam*)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.*

"[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786. Although § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens,

J., concurring)). Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford*, 537 U.S. at 24. Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786–87. Finally, "[i]f a state court's decision on a constitutional question is 'a close call,' that fact 'militates against the conclusion that the state court's application of the relevant Supreme Court precedent was objectively unreasonable.'" *Lovell v. Duffey*, 629 F. 3d 587, 598 (6th Cir. 2011) (quoting *Lopez v. Wilson*, 426 F. 3d 339, 358 n.1 (6th Cir. 2005) (en banc) (Cole, J., concurring)).

### III

### A

In his first claim for relief, Keys alleges that there was insufficient evidence to convict him of second-degree murder and assault with intent to commit armed robbery. Keys emphasizes that the prosecutor failed to establish that his conduct rose to the level of wanton and wilful disregard of the likelihood that his actions would cause death or great bodily harm, i.e., malice. The defense at trial denied that Keys was a part of the plan to rob Monroe, or that he aided and abetted in Gordon's actions in shooting Monroe. *See* Pet'r's Br. 4. Keys also alleges that the prosecution never presented legally sufficient evidence that he knew or intended Gordon to be armed. *Id.*

### 1

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with

-8-

which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). But the critical inquiry on review is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). This inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," but whether, after viewing the evidence in the light most favorable to the prosecution, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal citations and footnote omitted) (emphasis in original).

Importantly, a federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) ("Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."). State courts should thus be given great leeway in adjudicating sufficiency of evidence claims. *See Thompson v. Bock*, 215 F. App'x 431, 437 (6th Cir. 2007) (citing *Yarborough*, 541 U.S. at 663–64)).

Finally, on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F. 2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F. 3d 780, 788 (6th Cir. 2003). Therefore, this Court

does not apply the reasonable doubt standard when determining the sufficiency of evidence on habeas review. *Walker v. Russell*, 57 F. 3d 472, 475 (6th Cir. 1995).

**2**

Under Michigan law, the elements of second-degree murder are (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *See Stewart v. Wolfenbarger*, 595 F. 3d 647, 654 (6th Cir. 2010) (citing *People v. Goecke*, 579 N.W.2d 868 (Mich. 1998)). "[M]alice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Wolfenbarger*, 595 F.3d at 654 (citing *People v. Aaron*, 299 N.W.2d 304 (Mich. 1980)). Notably, "[t]he offense of second-degree murder 'does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences.'" *Wolfenbarger*, 595 F. 3d at 658 (quoting *People v. Aldrich*, 631 N.W.2d 67 (Mich. 2001)). The Michigan Supreme Court has indicated that "a jury can properly infer malice from evidence that a defendant set in motion a force likely to cause death or great bodily harm." *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980); *see also People v. Carines*, 597 N.W. 2d 130,136 (Mich. 1999) ("Malice may also be inferred from the use of a deadly weapon.").

Under Michigan law, the elements of assault with intent to rob while armed are (1) an assault with force and violence, (2) with an intent to rob and steal, and (3) while being armed with a weapon. *Alexander v. Robinson*, 11 F. App'x 456, 459 (6th Cir. 2001).

To support a finding that a defendant aided and abetted in the commission of a crime, the prosecutor must show that:

-10-

>1. the crime charged was committed by the defendant or some other person;
>
>2. the defendant performed acts or gave encouragement that assisted the commission of the crime; and
>
>3. the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement.

*Riley v. Berghuis*, 481 F. 3d 315, 322 (6th Cir. 2007) (citing *People v. Carines*, 597 N.W. 2d 130 (Mich. 1999)).

In order to be guilty of aiding and abetting under Michigan law, the accused must take some conscious action designed to make the criminal venture succeed. *Fuller v. Anderson*, 662 F. 2d 420, 424 (6th Cir. 1981). Aiding and abetting describes all forms of assistance rendered to the perpetrator of the crime and comprehends all words or deeds which might support, encourage, or incite the commission of the crime. *People v. Turner*, 540 N. W. 2d 728, 733 (Mich. Ct. App. 1995), *overruled in part on other grounds by People v. Mass*, 628 N.W. 2d 540 (Mich. 2001). The quantum or amount of aid, advice, encouragement, or counsel rendered, or the time of rendering, is not material if it had the effect of inducing the commission of the crime. *People v. Lawton*, 492 N. W. 2d 810, 816 (Mich. Ct. App. 1992). Finally, the Michigan Supreme Court has held that there is no language in Michigan's aiding and abetting statute that shows an intent by the Michigan Legislature "to abrogate the common-law theory that a defendant can be held criminally liable as an accomplice if: (1) the defendant intends or is aware that the principal is going to commit a specific criminal act; or (2) the criminal act committed by the principal is an 'incidental consequence[ ] which might reasonably be expected to result from the intended wrong.'" *People v. Robinson*, 715 N.W. 2d 44, 49 (Mich. 2006) (citation omitted).

To be convicted of aiding and abetting, the defendant must either possess the required intent

-11-

to commit the crime or have participated while knowing that the principal had the requisite intent; such intent may be inferred from circumstantial evidence. *See Long v. Stovall*, 450 F. Supp. 2d 746, 753 (E.D. Mich. 2006); *People v. Wilson*, 493 N. W. 2d 471, 476 (Mich. Ct. App. 1992). The intent of an aider and abettor is satisfied by proof that he knew the principal's intent when he gave aid or assistance to the principal. *People v. McCray*, 533 N. W. 2d 359, 361 (Mich. Ct. App. 1995). An aider and abettor's state of mind may be inferred from all of the facts and circumstances, including close association between the defendant and the principal, the defendant's participation in the planning and execution of the crime, and evidence of flight after the crime. *Turner*, 540 N.W.2d at 734.

Mere presence, even with knowledge that a crime is being committed, is insufficient to establish that a defendant aided and abetted in the commission of the offense. *People v. Norris*, 600 N. W. 2d 658, 663 (Mich. Ct. App. 1999); *Fuller*, 662 F. 2d at 424. "[H]owever, a claim of mere presence is not a 'catch-all excuse' to defeat an inference of guilt beyond a reasonable doubt. In evaluating a 'mere presence' defense, a factfinder must distinguish, based upon the totality of the circumstances, between one who is merely present at the scene and one who is present with criminal culpability." *Stovall*, 450 F. Supp. 2d at 754 (internal citation omitted). An aider and abettor who is intentionally present during the commission of a crime may be silent during the crime's commission, and yet "by his demeanor, or through behavior and acts not directly related to the crime, provide 'moral support' that is recognizable to, and relied upon by, the principal. Such acts may be silent and may not be overt but may still amount to more than 'mere' presence." *Sanford v. Yukins*, 288 F. 3d 855, 862 (6th Cir. 2002). Michigan's "broad definition" of aiding and abetting "easily encompasses situations where the alleged aider and abettor, although silent and not

-12-

committing acts directly related to the crime, was not 'merely' present, but providing emotional encouragement and support." *Id*.

**3**

The Michigan Court of Appeals rejected Keys's argument that the evidence was insufficient to sustain his convictions on both the second-degree murder charge and the armed robbery charge:

> Defendant first argues that the evidence was insufficient to support his convictions of second-degree murder and assault with intent to rob while armed. We disagree.
>
> \*   \*   \*   \*   \*
>
> In this case, Redmond testified that Gordon was in defendant's presence and eyesight when he placed a gun on the console of defendant's vehicle on the way to Monroe's house the night before Monroe's murder. Unable to find Monroe, the group abandoned their plans to rob Monroe that night, deciding to try again the next night. The jurors could infer from this testimony that defendant knew that Gordon had a gun and would again bring it on the subsequent attempt. Defendant maintains that the evidence shows that he did not plan or intend to assist an armed robbery, and that he actually tried to discourage and prevent Gordon from bringing a gun to the robbery. Defendant emphasizes that Redmond testified that he and defendant advised Gordon "a thousand times" that it was not necessary to use a gun because Monroe would be unlikely to resist the robbery. However, the jurors could infer from this testimony that defendant must have known about Gordon's gun, otherwise he would not have thought it necessary to tell him repeatedly not to use it during the robbery attempt.
>
> \*   \*   \*   \*   \*
>
> Additionally, defendant and Redmond did not previously know Gordon, which increased the risk that Gordon would not follow defendant's and Redmond's repeated instructions to not involve a weapon in the robbery attempt. Thus, a rational trier of fact could find that defendant was acting with the requisite "wanton and wilful disregard" of the possibility that death or great bodily harm would result. The evidence was therefore sufficient to support the requisite finding of malice for second-degree murder. Similarly, the evidence was sufficient to support defendant's conviction of assault with intent to rob while armed.

*Keys*, No. 264387, 2007 WL 395104, at \*1–\*2 (footnotes omitted).

Initially, it was Keys who contacted Redmond with a plan to rob Monroe. Moreover,

Gordon placed a gun in the console of Keys's vehicle as the men drove from Lansing to Big Rapids. Keys knew nothing of Gordon prior to sending him alone into Monroe's house to carry out a robbery, knowing full well he may be carrying a gun. Indeed, Redmond testified that Gordon insisted on bringing his gun inside Monroe's house in spite of requests that he leave it in the car. As a result, the jury could reasonably infer that Keys knew Gordon was armed when he entered Monroe's house to execute the robbery. This knowledge is sufficient to sustain Keys's conviction for assault with intent to rob while armed.

The evidence was also sufficient to sustain Keys's conviction for second-degree murder when the attempted robbery resulted in Monroe's death. Indicated above, a jury could reasonably conclude that Keys was aware Gordon was armed when he entered Monroe's house to commit a robbery. A number of cases have held that a defendant's participation in an armed robbery, while either he or his co-defendants were armed with a loaded firearm, manifested a wanton and reckless disregard that death or serious bodily injury could occur. This authority establishes that a defendant in such circumstances acted with malice aforethought so as to support a conviction for first-degree-felony murder on an aiding and abetting theory. *See Hill v. Hofbauer*, 337 F.3d 706, 719–20 (6th Cir. 2003) (intent for felony murder "can be inferred from the aider and abettor's knowledge that his cohort possesses a weapon."); *see also Carines*, 597 N.W.2d at 136; *Harris v. Stovall*, 22 F. Supp. 2d 659, 667 (E.D. Mich. 1998); *Turner*, 540 N. W. 2d 728, 736 (1995); *Redmond v. Jackson*, 295 F. Supp. 2d 767, 774 (E.D. Mich. 2003) ("Petitioner's act of providing a firearm to be used in an armed robbery demonstrated a wanton and wilful disregard of the fact that a person could be killed or suffer great bodily harm during the course of the robbery."). Although Keys was convicted in this case of the lesser-included offense of second-degree murder, the element of malice

-14-

required for statutory felony-murder is the same as that required for second-degree murder. *See People v. Flowers*, 477 N.W. 2d 473, 477 (Mich. Ct. App. 1991). When viewed in the light most favorable to the prosecution, the evidence established that Keys acted with the requisite malice aforethought so as to support his conviction under an aiding and abetting theory for second-degree murder.

Keys also alleges that the jury entered verdicts that are either inconsistent with a finding of malice aforethought or reflect a partial acceptance of the defense theory that he never intended that the robber be armed or that Monroe be injured. Pet'r's Br. 5. This argument stems from the fact that the jury chose not to convict him of conspiracy to commit armed robbery, but conspiracy to commit unarmed robbery. *Id*.

But even if the jury's two verdicts against Keys are inconsistent, inconsistency is an insufficient reason for setting aside a verdict. *Harris v. Rivera*, 454 U.S. 339, 345 (1981); *see also Mapes v. Coyle*, 171 F. 3d 408, 419–20 (6th Cir. 1999). The possibility that an inconsistent verdict may favor a criminal defendant as well as a prosecutor "militates against review of such convictions at the defendant's behest." *United States v. Powell*, 469 U.S. 57, 65 (1984). Notably, the fact that an inconsistent verdict might be the result of lenity on the part of the factfinder, coupled with the fact that the prosecutor is unable to obtain appellate review of a conviction, "suggests that inconsistent verdicts should not be reviewable." *Id*.

In sum, Keys is not entitled to habeas relief on his first claim.

**B**

Keys's second and third claims will be consolidated because both involve his allegation that he was denied the right to an impartial jury. As with his first claim, these two are without merit.

**1**

Keys first contends that he was denied a fair trial because the jury saw him in restraints. But even if the jury observed Keys's leg shackles, he is not entitled to habeas relief because any error would have been harmless in light of the overwhelming evidence against him. The shackling of a defendant is harmless error if there is overwhelming evidence of the defendant's guilt. *See Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005).

In the present case, there was compelling evidence that Keys was guilty of the charged crimes, or at least the lesser-included offenses. Several witnesses testified that it was his plan to rob Monroe, and that he was aware Gordon entered Monroe's residence armed with a deadly weapon. In light of this overwhelming evidence, Keys is unable to show that even if the jury did observe him in leg irons, he was denied due process and a fair trial, so as to entitle him to habeas relief. *Lakin*, 431 F. 3d at 966. Keys's second claim is without merit.

**2**

Keys's third claim alleges that appellate counsel was ineffective by failing to investigate and raise his second claim on direct appeal.

To show that he was denied the effective assistance of counsel under federal constitutional standards, Keys must satisfy a two prong test. First, he must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, Keys must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*.

Second, Keys must show that such performance prejudiced him. *Id*. To demonstrate

prejudice, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "*Strickland*'s test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011) (quoting *Harrington*, 131 S. Ct. at 792). The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel—not the state—to show a reasonable probability that the result of the proceeding would have been different but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009). The *Strickland* standard applies as well to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt*, 395 F. 3d 602, 617 (6th Cir. 2005).

This Court has already rejected Keys's shackling claim, concluding that he is unable to show actual prejudice in light of the fact that there was overwhelming evidence of his guilt. Accordingly, his ineffective assistance claim likewise fails. *See Taylor v. McKee*, 649 F.3d 446, 451 n.1 (6th Cir. 2011) ("It also appears that any claim of ineffective assistance of counsel would likely fail on the merits as it is not clear that Taylor was prejudiced by his being shackled in front of the jury."). Keys is not entitled to habeas relief on his third claim.

**IV**

Before Keys may appeal this Court's dispositive decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's

assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336–37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

Keys has not made a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is not warranted in this case. The Court further concludes that Keys should not be granted leave to proceed *in forma pauperis* on appeal, as any appeal would be frivolous. *See* Fed. R. App. P. 24(a).

## V

Accordingly, it is **ORDERED** that Keys's petition for writ of habeas corpus, ECF No. 1, is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED**.

It is further **ORDERED** that permission to proceed *in forma pauperis* on appeal is **DENIED**.

Dated: February 5, 2014                                s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 5, 2014.

                                            s/Tracy A. Jacobs
                                            TRACY A. JACOBS